The next case is Moms for Liberty v. Brevard Public Schools. Alan Gura is here for the appellants, Moms for Liberty. And Jennifer Bridges is here for the Brevard Public Schools. And Mr. Gura, you may begin when you're ready. The next case is Moms for Liberty v. Brevard Public Schools. Moms and dads, whether they're for liberty or for something else, care deeply about their role as their children's primary educators. They have a fundamental First Amendment right to speak before and petition their local school boards at public hearings. Of course, that means that parents and other members of the community share the school board's interest in ensuring proper decorum and good order, enabling everyone to be heard in what everyone agrees is a limited public forum. And that brings us here today, because while we do not question that the school board can exclude off-topic speech and improper behavior that is inconsistent with the forum's purposes, proper decorum and good order is also expected of school board members, and their code of behavior is found in the First Amendment. As a constitutional matter, the First Amendment requires that the school board tolerate all viewpoints on matters properly before the board. The school board cannot interrupt people, cut them off, extol them from the room, and threaten to have them arrested just because it deems their speech abusive or personally directed or unclean. The defendants have done and continue to do all these things, and it's time that the courts put a stop to it. The district court's judgment and order approving of Brevard Public Schools' censorship program contradicts well-settled First Amendment doctrines and invites a circuit split that no court could sustain. It should be reversed. The district court relied a lot on the contention that these policies, the various policies, were applied equally to people with different viewpoints. What's your response to that argument, to that finding from the district court? Discriminating against everybody equally is still discrimination. The First Amendment doesn't say that you can censor people's words and viewpoints so long as you hit both or all sides. The Supreme Court in Rosenberger said it's a misconception to think of the First Amendment as applying some kind of a bipolar concept that you can only side with one particular side and you have no freedom as to how you craft your arguments. People have the right to use the words and arguments and theories that they wish to raise on behalf of their positions. And it does not matter whether or not the way that they choose to advocate is offensive to the school board or whether the school board perceives that those words might be offensive to somebody in the audience. When we look at this record that we have in this case, we've got a nine-month window that reflects that there were 34 different individuals who identified themselves as Moms for Liberty members. They spoke a total of 109 times. They were only interrupted four times.  I think it's Mr. Colera who stated, quote, I will fight you, yelling and screaming and telling you things you do not want to hear. Close quote. So when we look at our precedent, it's clear that in a limited public forum, government officials who preside are entitled to maintain order and decorum as long as their policies do not discriminate based on the viewpoints expressed. Why doesn't that, the record that we have in this case, demonstrate that the chair of the Board of Public School Systems is within his or her authority to maintain some semblance of decorum in a limited public forum like a school board? Okay, several responses, Your Honor. First of all, it doesn't matter how many times specifically Moms for Liberty members themselves were interrupted or kicked out of the room. They were also in the room watching other people get interrupted and kicked out of the room. There's a policy to constantly interrupt, stop people, expel them. Mr. Chawla was not the only person who was expelled here in the record. And so people sit there, they view this, they watch this, and this alters the words that they use. The plaintiffs here have all testified that they are careful. They have to constantly alter the words on pins and needles. Some plaintiffs, Ms. Niecy, refrains from speaking altogether. As far as Mr. Chawla's speech is concerned and why he was expelled from the room, I think we have to look at Defendant Belford's carefully considered, I'm sure, very lengthy declaration that she filed. She stated that she evicted Mr. Chawla only, and I'm quoting here, this is paragraph 229, tab 20, only after he continued with his abusive, personally directed comments, which disrupted the audience and the board's ability to conduct its business. Now, when she talks about disrupting the audience and personally directed comments, she ties that into her theory that he was offending Democrats. She was, I guess this is not a very charitable view of Democrats, that they would react negatively to his speech. She was afraid that he was insulting the audience and that the audience would be upset and therefore there would be some kind of disturbance. She was affording basically a heckler's veto. With respect to Mr. Chawla's actual speech, we note that he was speaking in the future tense. He wasn't yelling. We can watch the video. The link to the video is in the record several times. He wasn't yelling. He wasn't loud. He was impassioned. And he was speaking in the future tense. And when we say, you know, I will fight you, well, respectfully, opposing counsel. It was after that that he was asked to leave. He was asked to leave after he told them that they didn't like the Constitution. And that, I think, was the last thing that Ms. Belford could tolerate. But she's made it very clear throughout her declaration that the issue here for her, the primary rationale here, is that if you criticize groups of people in the audience, in this case members of the Democratic Party, she feared would be upset. She said she silenced his criticism because the audience, quote, were clearly getting upset and she feared that behaviors were getting to escalate into a safety issue. He kept referring to it as the Democratic Party, and these are the things that go along with it, and people were getting upset as a result, close quote. Well, there is no heckler's veto. The government cannot silence speech just because members of a political party might be upset by this speech and act out. If people do act out, if people do misbehave in reaction to speech that offends them, then the correct response from the board is then to subdue those people. But Mr. Chalewa was merely expressing views. The views were related to, I believe, he was speaking then about his theories of the mask mandate. It was a matter properly relating to the functioning of the schools. If you had a client, a school board client, and they asked you to help them draft a policy that would ensure that they could maintain decorum, the decorum appropriate for a public meeting, while also respecting the First Amendment rights of the interested parents and other citizens, what would you tell them to write in that policy? I think that policy exists, Your Honor. It exists here in Brevard because we do not challenge the rule that states that the chair can exclude speech that is irrelevant, speech that is not going to the purposes of the forum. Remember, this is a limited public forum. It's about the operation of the schools. If people get up and they rant and rave and they insult and attack people without any connection to the purposes of the forum, they can be asked to leave, not because they're offensive, but simply because it's a limited public forum and we're not there to discuss this. Speaking of the forum issue, did you see our recent decision in McDonough? I'm sorry, Your Honor. It came out last week. I happen to know a good bit about that case since I wrote it, but our public forum doctrine, for better or for worse, that panel concluded that under our public forum doctrine here, city council meetings were generally non-public forums or designated public forums rather than limited public forums, which leads to a different standard. I believe that there's a Supreme Court precedent that talks about school board meetings as limited public forums, and that's the— Interestingly, there's not. I don't disagree that—anyway, I won't walk you through the analysis. It was complicated, but it's something to consider. Well, I have to look at that case and submit a 28-J letter. If it came out just last week, I apologize. However, we do know that viewpoint discrimination is not allowed in any kind of forum. And here we have viewpoint discrimination, whether it's limited public forum or something else. I mean, Mansky, of course, was a non-public forum case, which we cited. And the government cannot engage in viewpoint discrimination. Abusive speech, that sounds like a viewpoint. Personally directed, sounds like a viewpoint. Unclean, definitely a viewpoint. The question is, and remains under Reed, and this, of course, precedents applying Reed, the question is whether or not the—we have to look to the text of the speech to see what the message is, and the message derives from the rule. These rules are not agnostic as to content. Therefore, they are content-based, and at least there will be strict scrutiny. But here we actually have viewpoint discrimination, so they cannot survive. I can't recall. Did you raise as applied and facial challenges to each of these rules? Yes, you did. The district court dismissed the facial challenges initially. That order merges into the final judgment. We are challenging it. And then in the summary judgment stage, the district court ruled against us on the as-applied challenges. We think the district court erred both as a facial matter and an as-applied matter. Obviously, we have an item in the Sixth Circuit. With regard to statements that the district court identified as disruptive or obscene as not violating viewpoint discrimination, would those be findings of fact to which we would apply a clearly erroneous standard of review as to each individual statement? The issue is the—I believe it's a question of law, Your Honor. Okay. The question of law here is whether or not— But if the district court says this statement in particular is obscene, constitutes obscene language, and so to prohibit that at a school board meeting would not constitute viewpoint discrimination. Would that be a finding of fact to which we would apply a clearly erroneous standard of review? It is at least the next question of law, in fact, because whether something passes the Miller test or fails the Miller test is a legal question, Your Honor. And by the way, there was no assertion even by the defendants that anything here was legal obscenity. The issue is whether you can use certain words— But what if the district court determined that—made a determination as to whether or not it's abusive? A certain statement is abusive. That is a—abusive is a vague standard, Your Honor. The standard itself is something that we take issue with. It's in the eye of the beholder whether something— And didn't the person who created the speech code for Brevard testify that they didn't really know what abusive meant, what the meaning was, that she could just smell it? That's correct, Your Honor. She testified that abusive—she couldn't give a definitive definition, believe it were, of her words. This is a prototypical vague and overbroad standard. As the courts have found, the Sixth Circuit specifically struck down abusive and personally directed. So did the Eastern District of Pennsylvania. If this court goes the other way, that would be quite a circuit split, Your Honor, I think, that would not be countenanced by— Would we apply Miller v. California to determine whether or not a statement is obscene? Miller v. California does cover obscenity, but I think the importance of Miller here, Your Honor, is that the school board cannot ban speech as obscene if it doesn't actually violate Miller. Miller tells you what's obscene or not. There's no argument here that anything— We're talking about—obscenity here came in two forms so far on the record. First, school books. Books are in a school library that people want to read out loud. It's quite unusual for a school to claim that books in its library failed the Miller test. Second, there was a lady who was identified as Diane. This was referenced in tab 78, I believe, paragraph 41. It was also in tab 91. This is a woman who came to speak before the board and complained about the fact that a teacher who had been convicted of exposing himself had been allowed back on school premises. She said, what the hell is going on? Sorry, that was offensive to the defendants. And then she said that the teacher had been— this person had been convicted of exposing his penis on campus. And those two words caused the chair of the school board to call the deputies and have her squirt it out when she quite plainly and not very loudly said, I have a First Amendment right to say these things. And the chair said, deputies, and that was the end of it. And there's a video link to that as well, tab 78, paragraph 41 or 42. Is my understanding correct now that the personally directed challenge is now moot because the policy has been changed? No, Your Honor, it is not. The only thing that they changed with personally directed is that personally directed no longer applies to members of the school board. It does still apply to school personnel and other people. And so all that's described is Nancy, who's unwilling to come and speak about— she wants to criticize not the school board necessarily, but she wants to criticize other school officials, other school personnel. That is still prohibited by the personally directed statement. And of course, you know, Mr. Toliver was kicked out because he was perceived to be criticizing Democrats, and Democrats are still within the concept of personally directed. So you still cannot criticize or publicly name the teacher who exposed themselves? That's correct. And we also have—also in the record there's another incident about people who want to advocate for the rehiring of two coaches, for example. And they could refer to these two coaches, these two gentlemen, these coaches, but they couldn't use their names in the argument. That's tab 20 at pages 44, 45, paragraphs 106 through 09. That's Ms. Belfort's declaration. So obviously it's bigger than just naming the school board members, but it's hard to make political arguments and engage in political debates when we can't name the names of the people responsible for the policies or name the people that we want hired or fired or promoted or whatever, even in one instance praised. I see I'm way over my time, Your Honors, and I was going to reserve some, but— All right, well, you've got your time reserved. We'll hear from Ms. Bridges. Good morning, Your Honors. May it please the Court, Jennifer Bridges on behalf of the athletes. Throughout this case, including in the arguments that have been delivered to the court in their briefs and this morning, the appellants have engaged in a considerably revisionist version of the facts. The videos for the school board meetings at issue speak for themselves. In addition, I would note that, for example, the second reference that was given by counsel this morning, an oral argument concerning a purported ban on so-called obscene speech, specifically this teacher who allegedly exposed himself, those are facts that are not found within this record. Those were not pled facts. The court below had actually stricken additional attempts to include factual allegations to this effect in an amended complaint. So let me ask you a question. Can a parent read from a book that their child brings home from the library that they find problematic? Could they openly read from a book that a school board member would consider obscene? Your Honor, if the language in the book includes, for example, an expletive or sexually charged language, such as the example in this case, where somebody read from a book before even prefacing the fact that this was a book that they were reading from, then the chair would be within her rights to apply the policy. But how is that reasonable in light of the purpose of a school board meeting, which is to discuss matters pertaining to the school and the education of the children? So why should a parent, not every parent is particularly involved, but a parent who may be watching and doesn't realize that that particular book is in the library and now hears what that book is because they're not an involved parent? So, Your Honor, the only interruption in this case involving a book was simply one brief interruption asking the speaker to keep the comments clean with the chair not even realizing necessarily that it was a book that the speaker was reading from. But if the point the speaker is trying to make is that this book is inappropriate for children, how can they communicate that without reading the book in this public meeting? They certainly can, Your Honor. In fact, they could, in fact, read from the book to the extent that it does not include language that falls within the policy. But why is that a problem, right? I mean, if that's the problem with the book, I think it would tend to be much more shocking to interested parents to hear words that are so troubling that the school board doesn't want them read out loud. I think that would be more persuasive to other parents to care about the issue than it would be just to generally assert that there's an inappropriate book because, of course, parents have very different standards of what they think is appropriate and inappropriate. So why wouldn't this parent need to share the specifics of that book in order to get their point across? Because the overarching purpose of this policy, Your Honor, is to prevent disruption in the boardroom. So unlike Mansky, for example, where we're talking about reasonableness with an amorphous category such as political, which describes the purpose of this particular category of speech, the categories that we're talking about in our policy are describing the manner in which a viewpoint is being made. It is not prescribing the viewpoint itself. It is simply prescribing a certain manner in conveying that viewpoint in order to protect the occurrences in the boardroom from disruption and to maintain decorum and to ensure that the board is able to conduct its business in an orderly fashion.  Does that mean that people in the room who hear it will immediately start rioting? I mean, I find that hard to believe. No, Your Honor. In fact, the fact that in that particular circumstance where the book was being read, the speaker went on to continue quoting from books. In fact, she quoted from a book that was describing a relatively violent situation. She was not prohibited from doing so. The only interruption that came was immediately after the use of a profane word, and then she was allowed to continue on with her comments. So it is not that the policy is preventing parents from being able to read from books or express their viewpoints regarding those books, but there have to be limits. There have to be reasonable limits, and this Court and the Supreme Court have recognized over and over again that the government has a legitimate and important interest in maintaining the decorum in a limited public forum to allow. Let me ask you a question regarding requiring speakers. I'm going to direct you to the personally directed speech. How is it reasonable to not allow a speaker to name a specific teacher or school official when they are trying to discuss a school-related matter? Let's say you have a teacher who has decided that they are going to take away points for students who have red hair, and the parent wants to make sure that the parents who have children who have red hair are aware that this particular teacher is deducting points from that student, from students with red hair. How is that unreasonable? I have three responses to that, Your Honor. So first of all, below the focus has always been on wanting to make statements to school board members directly. The appellants never raised an issue about, I want to be able to address Teacher X over at Jones High School, or I want to be able to address Coach Y over at Smith High School. That was never an issue. It was always about, I want to be able to address my school board members directly. That is now allowed. What does the policy say specifically about personally directed comments? The policy states currently that personally directed comments are not allowed to be made except for statements that are made directly to school board members. Correct. So then if I'm a parent and I want to talk about Teacher X, who is unreasonably deducting points from students with red hair, I cannot do that, correct? That brings me to my other two questions. Yes or no? Yes or no? Yes, Your Honor. And the reason for that, as explained by the chair below, is because in that situation Teacher X, who is being accused of not being fair to students with red hair, is not in the boardroom to defend him or herself. If the issue is that I'm concerned about this teacher because they are discriminating against Teacher X. But isn't that the point of a school board meeting? Let's say I'm the parent and I go talk to the teacher. That's normal, the first instance. Teacher says, I don't care. Then I go to the principal. Principal says, I don't care. That's the point of the school board, which is to talk about school board-related matters, correct? It is, Your Honor. All right. Because that's your last step when no one is taking action, whether the principal or the teacher. That's when you go to the school board, correct? Correct. But there are also alternate ways of bringing this to the school board's attention as well. But if I'm a parent and I want to have a discussion, so other parents who may not be as involved, or maybe their children don't talk to them as much as this particular child does to this parent, and said, hey, this is what's going on in my classroom. So is this not a method and a way for a parent to get this matter to the school board and also to talk it to other parents and let them know that this is going on? Yes, Your Honor. But under MANSCAN, the reasonableness that we have to apply to this policy, the school board must only have objective workable standards. And it is an objective workable standard to say that if somebody wants to come in and make a statement that I'm concerned that there are teachers who are discriminating against students with red hair without specifically naming that teacher, and going to the school board separately and naming that teacher without having named them in the school board meeting, without that teacher present to defend him or herself, I think that is an objective workable standard. And there's a reason for it. And the reason for it is to prevent disruption, to prevent a teacher from necessarily being called out without the opportunity to be able to reply to that statement. So that is the basis behind the reasonable, personally directed provision of the policy as testified to below by our board chair. So I guess your answer to the question is that the policy does not prohibit the complaint. The policy would prohibit naming the teacher? That's correct, Your Honor. So anybody could stand up and make the complaint, but without just saying Teacher X's name. Are you familiar with our McDonough case that came out? I guess it wasn't last week, it was the week before last. So what would be your response if strict scrutiny applies here? Do you think that your rules still stand? I do, Your Honor. I believe that this is a viewpoint-neutral and a content-neutral policy and that it is narrowly tailored. However, I also believe that it's clear from this court's prior precedent that school board meetings and public comment sections of school board meetings are limited public fora. This court specifically said so in the Barrett case. And in the Barrett case, this court stated that in such a limited public fora as a school board meeting, that the policy must only be reasonable and viewpoint-neutral. And so this court has prior precedent on that issue specifically pertaining to school boards, and I believe that the court would be bound by that to apply the viewpoint-neutral standard to this case. The court does not have any other questions. Thank you, Ms. Bridges. We'll hear from Mr. Gura. Thank you, Your Honor, Your Honors. Tab 91-5, line 10, this is from Amy Neesey's deposition, and Ms. Neesey is actually here in the courtroom. Let me read for you what this says here. Quote, I want to be able to talk about individual senior staff members, programs that they're implementing, and what they're doing differently. I want to be able to be in that boardroom and not worry about being trespassed, being arrested, and being forced out of that room. Okay, so it's not just about discussing school board members. It's about discussing, in Ms. Neesey's words, senior staff members and the programs that they're doing. It's very hard to do that when you can't mention people's names. The First Amendment protects people's right to name government officials and government employees, especially when they are speaking at a meeting that is designed to review their behavior. The idea that we have to speak about them in this obtuse rule, we call this the Voldemort Rule in our brief, right, the he who must not be named. We have to understand that people's names are a big part of the discussion. We have a political candidate now these days who likes to give nicknames to his various opponents, right? I mean, and this is part of, I suppose, his appeal. He has a First Amendment right to do that, whether it's persuasive or not. So a parent has a First Amendment right in a limited public forum like a school board meeting that's covered by the press with everyone there to libel and defame and make derogatory comments about a teacher and the chair of the school board doesn't have the authority under the First Amendment to control those sorts of statements at a school board meeting? While the teacher is not present in a circumstance where it might result in a disruption of the school board meeting? We have very extended jury trials about libel and defamation. The school board is not an automatic instant jury that determines questions of libel and slander. Of course, libel is not protected by the First Amendment. But if people are offering views about a school employee or a public official and those views relate to the proper subject of a school board hearing, then those views have to be altered even if those views are going to be perceived as offenses. So a parent has carte blanche? No, a parent has carte blanche to tailor his or her views in the language that they see fit so long as what they are expressing is properly the subject of a school board hearing. And it is not for the school board to say, well, you can't name names. We want to police your language. I mean, we're having an argument about it. Well, I can understand how the chair of a school board can permit a parent to name names in certain circumstances. But there may be circumstances where the naming of the names is not permitted in a limited public forum if the chair of the school board meeting has an obligation to maintain decorum. There is no heckler's veto, Your Honor. I respectfully would disagree. The President of the Supreme Court and of this Circuit make very clear that protected speech cannot be silenced merely because there is a fear that members of the audience will have a negative reaction to it. That is not an appropriate basis upon which to censor people's expression. There is no heckler's veto in the First Amendment, and naming names, speaking about people is protected by the First Amendment. And if someone feels that they're defamed, they could bring a lawsuit against the speaker. That's correct. They could always bring a lawsuit. Obviously, it would be a publication to a third party in a limited public forum. Exactly. We have many treatises on defamation. It's not something that the school board chair can instantly decide and zap people on. I would simply submit, Your Honors, the conclusion. We're having an argument about which books people are allowed to discuss and whether the theories of the books, the language of the books, can or cannot be stated in public. That is so far afield from what the First Amendment permits that I think it really is a decision that the court should make here to reverse the district court. Thank you so much, Your Honors, for your time. All right. Thank you, counsel. The court will be in recess for 15 minutes. All rise.